[188  279
[188  316

# John W. Beckett, Assignee, et al., Appellants, *v.* Jonathan Allison and John W. Donnan and the Oil Well Supply Company.

*Evidence—Parol evidence—Written instrument—Sheriff's sale.*

On a bill in equity against the vendee at a sheriff's sale to compel a conveyance of land which it is alleged that he bought under a parol agreement that he would reconvey upon payment to him of a certain sum, if the alleged parol agreement is denied by the answer, the proof required at the hands of the plaintiff to overcome the answer must be clear, precise and indubitable, and must come from the mouth of at least two witnesses, or from sources that would be the equivalent of the testimony of two credible witnesses.

Argued Oct. 21, 1898. Appeal, No. 80, Oct. T., 1898, by plaintiffs, from decree of C. P. Washington Co., No. 944, in equity. Before GREEN, WILLIAMS, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity to enforce alleged parol agreement to reconvey land.

The Oil Well Supply Company filed a cross bill alleging that Allison and Donnan, the other two defendants, held the leasehold estates described in the bill in trust, inter alia, to pay its claim against Hart Brothers.

McILVAINE, P. J., filed the following opinion:

There are substantially two issues in this case. The first is raised upon the plaintiffs' amended bill, and is between the plaintiffs and the defendants, John W. Donnan and Jonathan Allison; the second is raised upon the cross bill of the Oil Well Supply Company, and is between that company, a nominal defendant, and John W. Donnan and Jonathan Allison, two of the other defendants. In aid of an orderly adjudication these issues, so far as possible, will be considered separately but without duplicating our findings of fact.

### FACTS FOUND.

From the testimony heard, and from the admissions of the parties in the pleadings, we find the relevant facts in this issue to be:

1. In 1891 John R., James, William C., Thomas and Guy Hart, five brothers, were engaged in different ways in the oil business. They owned, together, leases on nine adjoining farms near the borough of Washington, containing in the aggregate about 500 acres. John R. Hart and James Hart were partners under the firm name of "Hart Brothers," and were in the business of mining and producing oil, and were the principal owners of these leaseholds. Guy and Thomas Hart were in the business of drilling oil wells by contract, and Wm. C. Hart was a superintendent or field boss. On October 5, 1891, there had been drilled on these nine farms twenty-one wells, all of which produced oil. John R. Hart and James Hart, doing business under the firm name of "Hart Brothers," as producers, had caused these wells to be drilled, and Guy Hart and Thomas Hart, as contractors with "Hart Brothers," had drilled all or most of them for them. Wm. C. Hart, as an employee of "Hart Brothers," had superintended the operations on these leases.

To carry on operations it became necessary for the "Hart Brothers" to borrow large sums of money. On September 18, 1889, they made a loan from Joseph Seep, of Oil City, and on that day they delivered to him a bond in the penal sum of $75,000, conditioned for the payment of (1) a note of $35,000 bearing even date, one year after date, with interest; (2) all notes which they should thereafter give to the said Joseph Seep to secure future loans and advances; and (3) all notes given as renewals of said notes or any of them, or of the indebtedness thereby created.

To secure the payment of these notes given and to be given, a mortgage in the sum of $75,000, and bearing the same date, was executed and delivered to Joseph Seep, which was forthwith recorded and became a first lien on leaseholds 3, 4, 5, 6, 7, 8 and 9 before referred to, and hereafter described. All of the five brothers signed this bond and mortgage.

On January 19, 1891, the "Hart Brothers," James Hart and John R. Hart, gave to the Citizens National Bank of Washington, Pa., for borrowed money, a note with warrant of attorney to confess judgment for $10,000, due thirty days from date, and on January 24, 1891, as security therefor, executed and delivered to the bank a mortgage upon their interest in lease-

holds 3, 5, 6, 7 and 8 described and numbered in the plaintiffs' bill, which mortgage was recorded and became a second lien thereon. On March 19, 1891, Wm. C. Hart executed and delivered to "Hart Brothers" his judgment note for $10,000, payable in four months, which note was assigned and its payment guaranteed by "Hart Brothers" to the Citizens National Bank, and as security therefor Wm. C. Hart and John R. and James Hart as "Hart Brothers" delivered to the bank a mortgage upon their interest in leaseholds 2, 3, 5, 6, 7 and 8 hereinbefore referred to, which was recorded and became a third lien thereon. To a number of other persons in addition to Joseph Seep and the Citizens National Bank, John R. and James Hart, as "Hart Brothers," from time to time became indebted, a large part of which indebtedness was evidenced by judgment notes which could be entered on any day, but a part of which was not so evidenced but was due to creditors upon open book accounts. Among this last class of creditors were the Oil Well Supply Company and Guy and Thomas Hart.

2. On October 5, 1891, the following executions were issued: on three judgments in favor of J. R. McLain and against John R. Hart, James Hart and W. C. Hart, for the collection of the sum of $5,095; and on three judgments in favor of D. M. Campsey for the collection of the sum of $5,095. On October 9, 1891, the following executions were issued: on three judgments in favor of the Farmers & Mechanics National Bank of Washington, Pa., for the collection of $4,067.05, wherein the "Hart Brothers" were the defendants; on a judgment in favor of A. M. Brown, trustee, against John and James Hart for $550.81; on a judgment in favor of the Citizens National Bank against John Hart and James Hart for $10,000, being a judgment entered on the note to secure the payment of which the mortgage of date January 24, 1891 (hereinbefore referred to and which was a second lien on leaseholds 3, 5, 6, 7 and 8), was given; on a judgment in favor of John W. Donnan and Jonathan Allison against John and James Hart for $5,000; on four judgments in favor of J. W. Hill, cashier, against John R. and James Hart for the collection of $6,038.86; on a judgment in favor of M. V. Taylor against John and James Hart for $2,388.75; on a judgment in favor of Jonathan Allison against "Hart Brothers" for $6,200; and on a judgment in favor of Gideon Chapman against "Hart Brothers" for $5,000.

On October 10, 1891, the following executions were issued: on two judgments in favor of the Oil Well Supply Company against " Hart Brothers " for $1,626.75; and on November 11, the following executions were issued: on two judgments in favor of the Vernor Natural Gas Company against " Hart Brothers " for the collection of $476.54.

By virtue of these several executions the sheriff levied upon the right, title and interest of John Hart, James Hart, W. C. Hart, and "Hart Brothers" in and to the nine leaseholds described and numbered in the second paragraph of the plaintiffs' bill; also upon a leasehold known as the McLain lease, on which were two wells, and on two leases on small lots known as the Stocking lot and the Dalton lot, on each of which there was one well, and in due time advertised them for sale on November 14, 1891. The amounts of the executions upon which this levy was made aggregated, without costs or interest, over $51,000. In addition to the liens of these executions the Seep mortgage, on which the sum of $44,271.73 remained unpaid, and the third mortgage of the Citizens National Bank, on which there was due $10,500, were liens on parts of the leaseholds in question; making in all liens against them amounting to over $115,000. In addition to this, "Hart Brothers" at that time owed near $2,000 labor claims, owed the Oil Well Supply Company over $7,000 and Guy and Thomas Hart a claim for drilling wells which they fixed at $17,000, making the total indebtedness of the "Hart Brothers" over $140,000.

The nine leaseholds at the date of the sale were not worth in the market (that is, as assets for the immediate payment of debts) more than $55,000. They had, however, a speculative value contingent upon the rise of the price of oil, that would exceed this in an amount corresponding to the faith of the buyer in an immediate and extensive inflation of the oil market. At that time oil was very low and the market of oil property very dull, but there was a belief and hope among oil men that there soon would be a better price paid for oil.

3. At the sheriff's sale Jonathan Allison became the purchaser of the nine leasehold estates, aggregating about 500 acres, at the following prices (the sale discharging all liens except that of the first mortgage, on which was then due the sum of $44,271.73,—Frank Gabby lease (No.    ) $5.00; Wm.

Gabby lease (No.    ) $5.00; J. A. Howden lease (No.    ) $50.00; Wm. Paul lease (No.    ) $25.00; the second Wm. Paul lease (No.    ) $5.00; Wm. McDaniel lease (No.    ) $1.00: Enoch Prigg lease (No.    ) $100; Jas. P. Sayer lease (No.    ) $100; and A. McDaniel lease (No.    ) $100; or $391 for all.  Jonathan Allison bought these leasehold estates for himself and John W. Donnan, and they immediately after the purchase took possession, and the oil produced from that time until the present has been controlled by them.  From November 14, 1891, when they took possession, up until January 24, 1894, the immediate management of the leases was intrusted by Jonathan Allison and John W. Donnan to Guy Hart and Thomas Hart under an arrangement which we will hereafter fully set out.  W. C. Hart, who had worked on the leases for the Hart Brothers, was employed under Guy Hart and Thomas Hart to do work similar to what he had done before the sale.  The money necessary to pay the expenses of running the leases was paid by Jonathan Allison to Guy Hart, who paid it out to the employees and those furnishing material used on the leases.  From January 24, 1894, up to the date of the filing of the plaintiffs' bill, the defendants, John W. Donnan and Jonathan Allison, were in possession of said leaseholds and claimed to be the absolute owners thereof, and still maintain that claim.  On November 18, 1891, Geo. E. Lockhart, Esq., high sheriff of Washington county, acknowledged in open court his deed poll to Jonathan Allison for the leasehold estates in dispute, which was duly recorded and delivered to the vendee therein named.  The record of this sheriff's sale which precedes the acknowledgment and delivery of the sheriff's deed is regular and in due form, and the validity of the sale is in no way called in question.  Upon November 14, 1891, immediately after the sheriff's sale, John R. Hart, for himself and Hart Brothers, at the instance of John W. Donnan and James C. Boyce, executed and delivered a deed of assignment to Jonathan Allison of all the right, title and interest of the Hart Brothers in the leasehold estate bought by Allison from the sheriff, and in a few days thereafter James Hart signed said deed of assignment.  No consideration passed from Allison to the "Hart Brothers" at the time this deed was delivered, and no reason appears why it was executed and delivered except

that assigned by John W. Donnan, who says that the purpose was to have the title at once pass to Allison so that the contract could be concluded with Guy and Thomas Hart, and their mortgage secured to protect the Oil Well Supply Company's claim as had been agreed upon, the contract with Guy and Thomas referred to being the one hereinafter set out. On May 18, 1895, an alias execution was issued on the judgment of M. V. Taylor's Executor v. Hart Brothers, John R. Hart and James Hart, and the interest of the defendants in the leaseholds in question was levied upon and sold to A. W. Pollock, and A. W. Pollock, on June 19, 1896, assigned to John W. Donnan and Jonathan Allison the interest which he took under the sheriff's sale in said leaseholds. This sheriff's sale was instigated by John W. Donnan after Lee and Chapman, attorneys for the plaintiffs, had made their demand for an account, and at the sale he gave public notice that the defendants in the writ had no interest whatsoever in said leaseholds, but that they were owned absolutely by himself and Jonathan Allison.

4. When John R. Hart learned that executions had been issued against him by McLain and Campsey on October 5, 1891, he was exceedingly anxious to make some arrangement by which a sale of his property could be avoided. He endeavored to have them stay their executions until he could make some arrangement to have them paid, and might have succeeded had not other creditors issued other executions on October 9, 1891. John W. Donnan was president of the Citizens National Bank, the owner of the two $10,000 mortgages, and was an unsecured individual creditor of the Hart Brothers. Jonathan Allison was a director of the Citizens National Bank, and was also an unsecured individual creditor. The debt due Donnan and Allison by Hart Brothers was a debt which grew out of a transaction in which Donnan and Allison were jointly interested. After the McLain and Campsey executions issued it became the duty of John W. Donnan to look after the interest of the bank and the interest of himself and Jonathan Allison. On October 5 or 6 he sent for John R. Hart and inquired of him in regard to his indebtedness and the probability of his being able to get through. At the time of this conversation John W. Donnan had in his possession and control the two $10,000 judgment notes to secure the payment of which the two mortgages

were given to the Citizens National Bank, and two other judg-
ment notes given for the Hart Brothers' indebtedness to him-
self and Jonathan Allison on which judgment had not been
entered, and one purpose of the requested interview was to find
out if Hart Brothers had any other judgment notes outstand-
ing on which judgment could be entered and executions issued.
John R. Hart at this interview assured Donnan that they had
no other judgment notes out and that there was no other per-
son who could issue an execution against them and that he
thought they could make an arrangement with McLain and
Campsey to withdraw their executions.   Mr. Hart was anxious
to make some arrangement with his creditors that would pre-
vent the sale of his property by the sheriff.   On October 9,
1891, two or three days after this interview, other creditors
entered judgments and issued executions, and John W. Donnan
learning this fact entered judgment on the four judgment notes
he held and issued executions on three of them.   On that
evening or the evening of the next day, John W. Donnan,
John R. Hart, James Hart and Guy Hart had a meeting, and at
that meeting the situation of the "Hart Brothers" and how
far their property would go toward paying their debts, was dis-
cussed, and the conclusion was reached that they were hope-
lessly insolvent.   James and John then stated to Donnan that
they owed Guy and Tom about $17,000, and they hoped some
arrangement could be made that would secure something for
them; that they did not care for themselves; that they in-
tended to leave for some other field.   Donnan then proposed
that if Guy Hart and Thomas Hart would give a mortgage on
their individual interests in the leaseholds levied upon to the
bank, as collateral, to protect the payment of its two mortgages
of $10,000 each, that he would bid up the property, if necessary,
to a price sufficiently large to cover these two mortgages, and
in the event he or some one else in his behalf became the pur-
chaser at the sheriff's sale, he would place the management of
the leaseholds under the care of Guy and Tom for a term of
two years, with the understanding that the production of the
wells thereon should be run in the name of Jonathan Allison,
and the money realized therefrom, after payment of running
expenses, including pumper's wages to Guy and Thomas, should
be applied to the payment of the indebtedness owing the Citi-

zens National Bank and the indebtedness owing John W. Donnan and Jonathan Allison and on the Seep mortgage, and upon the expiration of the said two years, or at any time before, if payment in full of said indebtedness had been made or satisfactorily arranged for, the said leasehold properties should be assigned and conveyed by the defendants absolutely to the said Guy and Thomas Hart, Donnan and Allison in the mean time to look after the Seep mortgage that was overdue. As Thomas Hart was not present at this interview the proposition was taken under advisement until he could be seen. On October 24, 1891, the proposition was accepted by Guy and Thomas Hart and they, on October 26, 1891, executed and delivered to the Citizens National Bank the mortgage provided for in the contract, and immediately after the sheriff's sale they were intrusted with the management of the leases as herein before set out. When the sheriff's sale was made the price of oil was low and the market for oil property very dull, but a hope was being indulged that it would soon rise. Guy and Thomas Hart continued in the management of the leaseholds under Jonathan Allison until the winter of 1893–1894. The price of oil did not advance as was expected and the market continued dull. Under these circumstances Guy and Thomas Hart concluded they could do better elsewhere, and on January 22, 1894, they released and quitclaimed all interest they had in these leaseholds to Jonathan Allison and John W. Donnan and surrendered possession. John Hart, during the pendency of this proposition by Donnan to Guy and Thomas Hart, and before its acceptance, asked if the Hart Brothers would get anything if Guy and Tom should eventually sell this property, after they would get it, for more than their claim and was told that that was a matter that would lie wholly with Guy and Tom.

5. Shortly before, or sometime after, the sheriff's sale (we are unable to fix the date from the testimony, and it is immaterial) John W. Donnan, with the aid and consent of John R. Hart, acting for himself and his four brothers, mortgagors, made an arrangement with Joseph Seep, the holder of the first mortgage, that Donnan and Allison should receive an assignment of the notes and the mortgage to the extent that they should pay the same. In pursuance of this arrangement Donnan and Allison paid to Joseph Seep $10,000 on November 30, 1891,

$10,000 on December 23, 1891, $10,000 on February 24, 1892, and $8,387.24 on March 28, 1892, which, with the credits for oil sold, was payment in full of the $44,271.73 and interest due on the mortgage at the date of the sheriff's sale, and on the —— day of June, 1892, received from Joseph Seep an assignment of the notes and mortgage to Jonathan Allison, and he still has possession of the notes, and the mortgage assigned still remains unsatisfied. The four judgments entered by John W. Donnan, two in favor of the Citizens National Bank, one in his own favor and one in favor of Jonathan Allison, are not satisfied upon the record.

6. James Hart died September 24, 1894, and letters of administration upon his estate were granted to his widow, A. Luella Hart, a plaintiff herein. John R. Hart individually and as surviving partner of Hart Brothers, on October 12, 1896, assigned all interest in said leaseholds to John W. Beckett, a plaintiff herein, in trust for creditors.

In addition to the foregoing facts found we further find negatively: (1) That no agreement, understanding or contract relative to the purchase of these nine leasehold estates in question at the sheriff's sale was had or entered into before the sheriff's sale, or at any time, by the defendants John W. Donnan and Jonathan Allison, or either of them, with John Hart and James Hart, or either of them, or any other person, whereby it was agreed or understood " that said nine leaseholds should be purchased for the Citizens National Bank; that the purchaser should hold title thereto and possession thereof as security to pay the indebtedness due to Joseph Seep and the Citizens National Bank; that the purchaser should have the management of said leaseholds and receive the moneys and profits derived from the then producing wells thereon, and should apply the same to the payment of the interest and principal of the aforesaid indebtedness; that upon full payment of said indebtedness said leaseholds should go to the Oil Well Supply Company which, out of the moneys and profits derived therefrom as aforesaid, should pay itself about the sum of $9,000 and the interest thereon, due it from the Hart Brothers, John R. Hart and James Hart, and upon full payment of said last-mentioned sum said leaseholds should go to Hart Brothers, James Hart and John R. Hart," as is set out in the plaintiffs' bill; (2) that

no person or persons were "prevented or deterred from bid-
ding" at the sheriff's sale by the knowledge of the existence
of any such contract, or by the reason of any contract with
John R. Hart and James Hart, as Hart Brothers, or individ-
ually, to which John W. Donnan and Jonathan Allison, or
either of them, was a party, or of which they had knowledge.

The court answers the request on behalf of the plaintiffs, to
find the following facts, as follows:

1. From the summer of 1884 until September 24, 1894, the
date of the death of the latter, John R. Hart and James Hart
were partners under the firm name and style of Hart Brothers.
Until about October 1, 1891, they were engaged in producing
petroleum oil and gas in Washington County, Pennsylvania.
*Answer:* Adopted.

2. On November 14, 1891, John R. Hart and James Hart,
individually, and as the firm of Hart Brothers, owned interests
in the leasehold estates described in paragraph 2 of the bill, the
record title thereof then being as follows, viz: (1) in the Frank
M. Gabby lease, Hart Brothers owned an undivided three-
twelfths interest; (2) in the east half of the W. A. Gabby lease,
Hart Brothers owned the entire interest; (3) in the Bellevue,
or John A. Howden lease, John R. Hart and James Hart owned
the entire interest; (4) in the William McDaniel lease, John R.
Hart owned the entire interest; (5) in the Enoch Prigg lease,
Hart Brothers owned an undivided seven-eighths interest;
(6) in the James P. Sayer lease, Hart Brothers owned the en-
tire interest; (7) in the Andrew McDaniel lease, John R. Hart
and James Hart owned the entire interest; (8) in the William
Paul fifty acre lease, Hart Brothers owned an undivided five-
eighths interest, W. C. Hart, Guy Hart, and Thomas Hart
each owning an undivided one-eighth interest therein; (9) in the
William Paul forty-seven and three-quarter acre lease, John R.
Hart and James Hart owned the entire interest. All of said
nine leases are for the purpose of drilling and operating for
petroleum and gas upon the lands therein described, for a speci-
fied term of years (the shortest term being for three years), and
as much longer as oil and gas are found in paying quantities.
*Answer:* Adopted.

3. W. C. Hart, Guy Hart and Thomas Hart, on November 14,
1891, claimed to own undivided interests in certain of the above

leaseholds, which had been assigned to them by parol by Hart Brothers, and for which they had no paper or record title whatever. The production, however, from the leases in which W. C., Guy and Thomas claimed to have undivided interests, was run upon the books of the pipe-line company to the credit of Hart Brothers until about November 14, 1891. *Answer:* There is nothing in the testimony that enables the court to answer this request affirmatively.

4. On September 18, 1889, James Hart, John R. Hart, W. C. Hart, Guy Hart and Thomas Hart executed and delivered to Joseph Seep their certain bond or obligation in the sum of $75,000, conditioned for the payment of (1) a note made by the obligors to the order of Joseph Seep for $35,000, bearing even date, and payable with interest in one year from its date; (2) all notes which the obligors should thereafter give to the order of Joseph Seep to secure future loans and advances, and (3) all notes given as renewals of said notes or any of them or of the indebtedness thereby created. *Answer:* Adopted.

5. To secure the payment thereof, the above mentioned five obligors on September 18, 1889, executed and delivered to Joseph Seep a mortgage bearing that date, which was forthwith recorded, and became a first lien upon leaseholds 3, 4, 5, 6, 7, 8 and 9 described in paragraph 2 of the bill. *Answer:* Adopted.

6. The said $35,000 note, and a $10,000 note, dated September 28, 1889, and signed by the five Hart Brothers for money loaned by Joseph Seep, were paid out of oil run to the credit of Hart Brothers, and were surrendered to John R. Hart after payment; and the said mortgage was, until after November 14, 1891, held and retained by said Seep as security for subsequent loans made by him to the firm of Hart Brothers alone, which loans were evidenced by six promissory notes, dated, and for the amounts, as follows, viz:

| | | |
|---|---|---:|
| Dec. 27, 1889, payable in 6 months, for | | $10,000.00 |
| Feb. 5, 1890, | 3 | 10,000.00 |
| Mar. 3, 1890, | 4 | 10,000.00 |
| Apr. 3, 1890, | 3 | 8,000.00 |
| May 3, 1890, | 3 | 5,864.32 |
| June 3, 1890, | 30 days | 3,793.71 |
| Total | | $47,658.03 |

VOL. CLXXXVIII—19

Each of said notes was drawn payable to the order of Joseph Seep and was signed "Hart Bros. by John Hart." *Answer:* Adopted; but these loans were made on the credit of the bond and mortgage of the five brothers, Seep understanding that the Hart Brothers, for whom John signed, included the five brothers.

7. On January 19, 1891, Hart Brothers, James Hart and John R. Hart, executed and delivered to Citizens National Bank their bill single and warrant of attorney for $10,000, due thirty days from date, and on January 24, 1891, as security therefor, they delivered to said bank a mortgage of that date upon their interests in leaseholds 3, 5, 6, 7 and 8 described in paragraph 2 of bill, which mortgage was recorded and became a second lien thereon, and the amount due thereon was, on November 14, 1891, liquidated at No. 67, February term, 1892, in the common pleas of Washington county by am. sci. fa. sur mortgage and confession of judgment in the sum of $10,552.50. *Answer:* Adopted.

8. On March 19, 1891, W. C. Hart executed and delivered to Hart Brothers his judgment note for $10,000, payable in four months, which note was assigned and guaranteed by Hart Brothers to Citizens National Bank, and, as security therefor, on said date said W. C. Hart and Hart Brothers delivered to said bank a mortgage upon their individual interests in leaseholds 2, 3, 5, 6, 7 and 8, described in parapraph 2 of bill, which mortgage was recorded and became a third lien thereon, and the amount due thereon was, on November 14, 1891, liquidated at No. 68, February term, 1892, in the common pleas of Washington county, by am. sci. fa. sur mortgage and confession of judgment in the sum of $10,512.17. *Answer:* Adopted.

9. John R. Hart and James Hart, individually, and as the firm of Hart Brothers, became financially embarrassed, and from October 5, 1891, to October 10, 1891, executions were issued upon judgments against them, which executions became liens upon their interests in the leaseholds, described in paragraph 2 of plaintiff's bill, in the following order, viz:

1. (*a*) Sundry executions aggregating $11,947.05; (*b*) A. M. Brown, trustee, v. John R. Hart and James Hart; No. 308, November term, 1891; debt $527.02; fi. fa. No. 74, November term, 1891; on November 14, 1891, the debt, interest and costs, viz: $550.81, were assigned to Jonathan Allison, and so re

turned by the sheriff; debt, $550.81.    2. (*a*) Citizens National Bank v. Hart Brothers, James Hart and John Hart, No. 309, November term, 1881; fi. fa. No. 76, November term, 1891; debt, $10,000.   Said judgment being secured by mortgage described in seventh finding of fact.   (*b*) Jonathan Allison and John W. Donnan v. John Hart and James Hart, No. 310, November term, 1891; fi. fa. No. 77, November term, 1891; debt, $5,000.    3. M. V. Taylor v. Hart Brothers, John R. Hart and James Hart; No. 315, November term, 1891; fi. fa. No. 81, November term, 1891; debt, $2,388.75.    4. Sundry executions aggregating $5,913.    5. Jonathan Allison v. Hart Brothers and John Hart; No. 317, November term, 1891; fi. fa. No. 83, November term, 1891; debt, $6,200.    6. Sundry executions aggregating $7,625.    7. Executions of Oil Well Supply Co., aggregating $1,626.78.    *Answer:* Adopted.

10. By virtue of which several writs of fi. fa. the sheriff of Washington county, on October 30, 1891, levied upon all the right, title and interest of John Hart, James Hart and W. C. Hart, and Hart Brothers, in and to twelve leaseholds for oil and gas purposes, nine of which leaseholds are described at length in paragraph 2 of the bill.  *Answer:* Adopted.

11. At the time of the issuance of the writs of fi. fa. set forth in paragraph 9 of this finding of facts, John W. Donnan was and now is a member of the bar of Washington county, and president of Citizens National Bank; and Jonathan Allison at said time and until August 27, 1897, was director thereof; and said Donnan was attorney of record for said bank in the proceedings upon the writ of fi. fa. aforesaid; and all the business of said bank relating ·to the transactions involved in this suit was conducted by said Donnan and Allison. *Answer:* Adopted.

12. On October 27, 1891, at Oil City, it was arranged between John W. Donnan, on behalf of himself and Jonathan Allison, John R. Hart, on behalf of Hart Brothers, and Joseph Seep, that if said Allison should purchase the leaseholds at the sheriff's sale then pending, upon payment thereof Joseph Seep would assign to Allison the $75,000 mortgage described in paragraph 4 of this finding of facts, and that as soon as the amounts due by Hart Brothers to the Citizens National Bank, John W. Donnan and Jonathan Allison, and the amount due upon said

mortgage should be fully paid, said Allison would transfer the leaseholds back to Hart Brothers. *Answer:* Denied, if by Hart Brothers is meant the firm of Hart Brothers, John R. Hart and James Hart being the members thereof.

13. Subsequent to this arrangement, but some time before November 14, 1891, it was found that the Oil Well Supply Company intended to bid up the property at the sheriff's sale for the purpose of realizing upon its claim (a part in judgment and a part not in judgment) against Hart Brothers, and an arrangement was then made between John W. Donnan (on behalf of himself, Allison and Citizens National Bank) Oil Well Supply Company, and Hart Brothers, that as the interests of Hart Brothers in the leaseholds were regarded as worth over $100,000 they could be made to pay the amount of the Seep mortgage, the indebtedness due to Citizens National Bank, Allison, Donnan and Oil Well Supply Company, in a short time; that Oil Well Supply Company should not bid at the sheriff's sale; that said Donnan should control the sheriff's sale (he being willing to bid $20,000 for the leaseholds); the leaseholds should be bought by said Donnan, Allison or the bank; and the title should be conveyed to Guy Hart and Thomas Hart, who should secure the indebtedness to Citizens National Bank, Jonathan Allison and John W. Donnan; and secure the indebtedness to Oil Well Supply Company; and after the payment of these debts, the said Guy Hart and Thomas Hart should retain said leaseholds, until out of the production of the same, an indebtedness due to them from Hart Brothers was paid in full, after which payments the interests in said leaseholds sold at sheriff's sale should revert to Hart Brothers. During the whole of the negotiations John W. Donnan was anxious to secure the payment of the claims against Hart Brothers of Citizens National Bank, Allison and himself, and his efforts were to accomplish that end. *Answer:* Denied.

14. In pursuance of said agreement, and relying upon the carrying out of the same, the Oil Well Supply Company, though represented at said sheriff's sale, refrained from bidding upon the leaseholds offered for sale, and John W. Donnan was suffered to control and direct the said sale, and the sheriff, on November 14, 1891, sold the said leaseholds to Jonathan Allison for the sum of $391, subject to the Joseph Seep mortgage set

forth in paragraph 5 hereof, and the same was afterwards re-
turned by the sheriff as sold to said Jonathan Allison. *Answer:*
Denied.    There was no such agreement as the one herein re-
ferred to.

15. Said sheriff, by deed poll, dated November 14, 1891, ac-
knowledged in open court on November 18, 1891, conveyed said
leaseholds to Jonathan Allison.    Upon the said November 14,
1891, John R. Hart, James Hart and Hart Brothers, at the
solicitation of John W. Donnan, executed and delivered to said
Jonathan Allison, for the consideration therein stated (viz:
" the sum of one dollar and of other divers and valuable con-
siderations ") a deed of assignment of all their interests in the
said leaseholds.    John R. Hart, James Hart and Hart Brothers
received no consideration upon delivery of said deed.    Said
Allison subsequently conveyed to said Donnan an undivided
interest in said leaseholds.    *Answer:* Adopted.

16. On November 16, 1891, Jonathan Allison and John W.
Donnan took possession and management of said leaseholds, and
of the receipt of the moneys and profits arising from the pro-
ducing wells thereon, and ever since have held and continued
such possession and management.    W. C. Hart had, prior to
this date, been, for Hart Brothers, superintendent of said lease-
holds, and was continued after the sale in charge of the pump-
ing and operating thereof.    The said Jonathan Allison failed to
convey the leaseholds to said Guy Hart and Thomas Hart; and
the said Guy Hart and Thomas Hart never gave their mortgage
to Oil Well Supply Company as agreed upon.    On January 24,
1894, Guy Hart and Thomas Hart, for no consideration paid to
them, executed and delivered to the said Allison and Donnan
a written assignment of all their interests whatsoever in the
leaseholds involved in this controversy.    *Answer:* As a whole,
this finding is not adopted, as it appears to negative the fact that
Guy and Thomas Hart were put into the management of the
leases and that W. C. Hart worked under them.

17. The sheriff omitted to levy upon numerous articles of
personalty owned by Hart Brothers, consisting of drilling tools,
a horse, saddle, single and double harness, sleigh and buggy, and
at the suggestion of Donnan and Boyce these articles were
turned over to Allison (who paid no consideration therefor) by
Hart Brothers on November 14, or soon thereafter, as a payment
on account of their indebtedness.    *Answer:* Adopted.

18. In April, 1892, Jonathan Allison had paid Joseph Seep the full amount of principal and interest due since November 16, 1891, upon the six notes set forth in paragraph 6 hereof, and Seep thereupon assigned to him the bond and mortgage securing them. Said bond Allison never surrendered to the obligors therein, stated in paragraph four hereof; and the said mortgage was never satisfied of record. These notes, the principal and interest aggregating more than $47,000, in June 1892, were indorsed without recourse by him to said Allison by agreement between Hart Brothers and said Donnan, in order to "preserve a claim against Hart Brothers to the extent of the amount so paid" by Allison since November 16, 1891. Said notes have never been surrendered to Hart Brothers by said Allison. Said Allison and Donnan, since November 14, 1891, have never satisfied of record the judgments set forth in paragraph 9 hereof, entered in the common pleas of Washington county, at Nos. 308, 309, 310 and 317, November term, 1891, but have kept the same open as enforceable claims against John R. Hart, James Hart and Hart Brothers ; nor have the mortgages mentioned in paragraphs 7 and 8 of this finding of facts been satisfied of record, although they have been paid in full by said Allison and Donnan. *Answer:* Adopted, with this modification : it does not appear that the same "have been kept open as enforceable claims against the Hart Brothers."

19. On April 23, 1895, Hart Brothers, through counsel, by letter, demanded from Donnan an account of the balance due against the leaseholds on account of the Seep and bank indebtedness. On May 15, 1895, this was denied by Donnan on the ground that Hart Brothers were not entitled thereto. On May 18, 1895, upon an alias fi. fa., issued upon judgment of M. V. Taylor's Executors v. Hart Brothers, John R. Hart and James Hart, the interests of defendants in the leaseholds described herein, were sold by the sheriff, and returned by him as sold to A. W. Pollock for the sum of $40.00, which sum was paid by the said Donnan. Donnan and Allison gave notice at said sale that defendants had no interest whatsoever in said leaseholds, and that they owned them absolutely, by virtue of the two deeds to Allison of November 14, 1891. Said Pollock, on June 19, 1896, for no consideration, assigned to Allison and Donnan whatever interest he had acquired at said

sheriff's sale. Donnan instigated and procured said sheriff's sale, because of the demand for the aforesaid account, and to divest Hart Brothers of whatever interest they had in the leaseholds. *Answer:* Adopted.

20. James Hart died September 24, 1894, and letters of administration upon his estate were granted to his widow, A. Luella Hart, a plaintiff herein. John R. Hart individually and as surviving partner of Hart Brothers, on October 12, 1896, assigned all interest in said leaseholds to John W. Beckett, a plaintiff herein, in trust for individual and partnership creditors. *Answer:* Adopted.

Upon the findings of fact, or sufficient of them so to do, the court is requested, on behalf of the plaintiffs, to find the following conclusion of law: The plaintiffs are entitled to a decree against the defendants for an accounting in accordance with the prayers of the bill herein filed. *Answer:* Denied.

### CONCLUSIONS OF LAW.

From the facts found we are of the opinion, and find as follows:

1. As against John R. Hart, James Hart and the firm of Hart Brothers, Jonathan Allison, by virtue of the sheriff's sale and the deed poll of the sheriff, George E. Lockhart, took an absolute and indefeasible title to the nine leasehold estates in question.

2. The deeds taken and held by the defendants do not, under the facts proved and found, constitute a mortgage on said leasehold estates.

3. Under the facts proved the plaintiffs are not entitled to redeem and have possession of said leasehold estates upon paying what shall be found remaining due the defendants.

4. The plaintiffs are not entitled to the account prayed for, nor to an injunction restraining the defendants from selling or incumbering said leaseholds.

### OIL WELL SUPPLY CO. v. DONNAN AND ALLISON.

#### FACTS FOUND.

In addition to the facts found and hereinbefore set out, we further find, as specially applicable to this issue, these facts, to wit:

1. The Oil Well Supply Company is a corporation, with its principal office and place of business in Pittsburg. In 1891, and for some years prior thereto, it had a branch store at Washington, Pa.; in charge of Frederick C. McKee. James C. Boyce was the general or principal attorney of the Oil Well Supply Company and had charge of all its legal business, with his office in the city of Pittsburg, Pa. John W. Donnan, one of the defendants, was the local attorney of the company at Washington, Pa.

2. On October 10, 1891, Frederick C. McKee caused two judgments to be entered in the prothonotary's office of this county in favor of his company, on two judgment notes executed by the " Hart Brothers," and obtained from John W. Donnan, as attorney for the company, at his office, a præcipe for fi. fas. on said judgment which he handed to the prothonotary. The executions were issued and are referred to in our findings of fact, supra.

3. James C. Boyce, the principal attorney of the company, some days afterwards, at least two weeks before the day of the sheriff's sale, came to Washington to look after the company's interest and took charge of the company's claim against the Hart Brothers, which was only partly represented by the judgments entered by McKee. Before coming to Washington Mr. Boyce had made some inquiry of John Hart as to the value of the property in question and had endeavored to get what information he could from other sources as to the situation. From what he thus learned he concluded that his company would be safe in buying the property at $70,000, and thought they might bid it to that amount. After he came to Washington and received further information, and had a talk with Mr. Donnan, he changed his mind. He learned from Mr. Donnan that he would not bid the property higher than was necessary to cover the two mortgages of the Citizens National Bank, and that he proposed to lose the claims of himself and. Allison rather than put any more money in it which would go to creditors who, in order of liens, intervened between the bank's mortgages and his and Allison's executions,—the intervening executions amounting in all to over $20,000. Mr. Donnan told Mr. Boyce that he would or intended to bid a sum sufficient to cover the two bank mortgages if necessary, but suggested that if Boyce

would bid beyond that sum for the Oil Well Supply Company he might have the property so far as he was concerned. Before this conversation Boyce had learned of the arrangement that had been made by which Guy Hart and Thomas Hart were to have the property conveyed to them if Donnan should get it at or within the bid that he proposed to make. He concluded that it would be better for his company to make an arrangement with Guy Hart and Thomas Hart, if it could be done, rather than bid a sum greater than Donnan proposed to bid, if necessary, to protect the bank's mortgages. An interview was had between Mr. Boyce and Guy Hart and Thomas Hart, in which it was agreed by Guy Hart and Thomas Hart that if they got title to the property under the arrangement they had with Donnan, they would give a second mortgage on the leasehold conveyed to them by the sheriff's vendee to secure the payment of the Oil Well Supply Company's claim. This arrangement was made with Mr. Donnan's consent and in his presence, and was made after the agreement between Donnan and Guy and Thomas Hart had been consummated and the mortgage of Guy and Thomas, hereinbefore referred to, delivered. Mr. Boyce communicated the arrangement that he had effected with Guy and Thomas Hart to Mr. Eaton, the president of his company, and it was suggested that negotiable notes that could be discounted in bank should be gotten from Guy and Thomas Hart for the Oil Well Supply Company's debt, as well as the mortgage on the leaseholds that would be conveyed to them. With this in view Mr. Boyce on November 12, 1891, prepared a written agreement "between Guy Hart and Thomas Hart of the first part and Oil Well Supply Company of the second part," in which Guy Hart and Thomas Hart were made to agree to give notes as well as a mortgage on "all such property of the Hart Brothers" that Guy and Thomas agreed "to purchase from Jonathan Allison." This paper was left with Mr. Donnan with the request that he ask the Harts to sign it. He did. They refused to do so, on the ground that they had not agreed and would not agree to become personally liable for the debt of the Oil Well Supply Company, but expressed a willingness to give the mortgage which they had agreed to give. On the morning of the sheriff's sale, November, 14, 1891, Mr. Donnan informed Mr. Boyce of the re-

fusal of Guy and Thomas Hart to sign the agreement he had prepared, but that they were willing to give the mortgage as they had agreed to do. Mr. Boyce remarked that this would leave him without security. Mr. Donnan then proposed that Boyce bid up the property to cover the bank's mortgages and he would make the terms of payment so it could easily be met and he could take title. He also proposed that if Allison got the property that he would not convey to Guy and Thomas Hart until they would give the mortgage they agreed to give. Donnan, Allison and Boyce shortly after this conversation attended the sheriff's sale, and the property in question was bought by Allison as hereinbefore stated. Boyce made no bid on the property. After the sheriff's sale there was some further effort made by Boyce to get Guy Hart and Thomas Hart to sign the notes, but he never succeeded, and on January 22, 1894, Guy Hart and Thomas Hart voluntarily surrendered all claim they had in these leaseholds to Allison and Donnan, as hereinbefore found.

4. Before Guy and Thomas Hart executed the release of date January 22, 1894, and surrendered possession, John W. Donnan notified James C. Boyce of their purpose to do so, and offered to sell or turn over the leasehold estates to the Oil Well Supply Company if they would pay what was due him and Allison under the arrangement they had to convey to Guy and Thomas Hart, placing the sum necessary to reimburse and pay them at $51,000, and offered to make the terms of payment easy. The matter was taken under advisement by the Oil Well Supply Company and they sent an expert representative out to examine the leases and property thereon; and after an examination the company, on April 23, 1894, declined to take the property at the price named. After this date the defendants, under the belief that the property was now their own absolutely and without condition, expended large sums of money in drilling new wells and improving the property.

The court answers the request on behalf of the Oil Well Supply Company, to find the following facts, as follows:

1. John and James Hart, doing business as Hart Brothers, on November 14, 1891, had acquired and owned large interests in and were operating leaseholds for the production of oil and gas, described in the several subdivisions numbered 1, 2, 3, 4, 5,

6, 7, 8 and 9 of paragraph 2 of plaintiffs' bill, and Guy and Thomas Hart, brothers of said John and James Hart, owned together interests in certain of the same leaseholds, to wit: in subdivision numbered 2, in said paragraph, and undivided one sixth of forty-seven acres; and in subdivisions numbered 4, 5, 6, 8 and 9 an undivided one-fourth interest in each, as described in paragraph 2 of the answer of Allison and Donnan to the said bill. *Answer:* Adopted.

2. In the month of October, 1891, the said Hart Brothers were insolvent, being indebted to Joseph Seep upon a mortgage dated September 18, 1889, recorded in M. B. No. 19, p. 179, in a balance of about $40,000; and to the Citizens National Bank of Washington, Pa., upon two mortgages dated respectively January 24, 1891, and March 19, 1891, and recorded respectively in M. B. No. 22, p. 93, and M. B. No. 22, p. 320, liquidated on November 14, 1891, the former by an am. sci. fa. to No. 67, February term, 1892, in the sum of $10,552.50, and the latter by am. sci. fa. to No. 68, February term, 1892, in the sum of $10,512.17; and to John W. Donnan and Jonathan Allison in the sum of $5,000 in judgment; and to Jonathan Allison in the sum of $6,200, in judgment; and to the Oil Well Supply Company in the sum of $9,035.79, of which the sum of $1,626.61 was in judgment; and to Guy Hart and Thomas Hart aforesaid in a disputed amount between $7,000 and $17,000; and to divers other creditors in amounts also in judgment; and, on October 9, 1891, judgment was entered to No. 309, November term, 1891, in favor of the Citizens National Bank against Hart Brothers for $10,000 upon the note for that amount dated January 24, 1891, secured by the defendant's mortgage for said amount of said date, above mentioned, and execution issued thereon; so that by the sheriff's sale of said leaseholds as the property of Hart Brothers on November 14, 1891, all the liens thereon except the said mortgage to Joseph Seep were divested. *Answer:* Adopted.

3. On October 5, 1891, executions were issued on judgments against Hart Brothers, aggregating about $10,380; and on October 9, 1891, executions were issued upon judgments against Hart Brothers, aggregating about $39,774.28, including executions upon the judgment for $10,000 in favor of the Citizens National Bank, entered on the note secured by the mortgage to

said bank, dated January 24, 1891, and upon the judgment for $5,000 in favor of Allison and Donnan, and upon the judgment for $6,200 in favor of Jonathan Allison; and on October 10, 1891, said John W. Donnan, as the attorney of the Oil Well Supply Company entered judgments to Nos. 326 and 327, November term, 1891, in favor of said company, for $583.28 and $1,043.50 respectively, and upon said judgments the said Donnan as such attorney issued executions the same day, the said Donnan then having for a long time been the regular attorney of said company in charge of its legal business in Washington county; and under said executions, together hereinbefore mentioned, the sheriff of said county levied upon all the right, title and interest of John Hart and James Hart and Hart Brothers, and W. C. Hart, in and to twelve leaseholds for the production of oil and gas, situate in Washington county, nine of which leaseholds are those described at length in the several subdivisions of paragraph 2, of plaintiff's bill. *Answer:* Adopted.

4. At the time of the issuance of the said executions and the said levies thereunder, said John W. Donnan was and now is a member of the bar of Washington county and president of said Citizens National Bank, and was the attorney of record for said bank in the proceedings aforesaid; and the said Jonathan Allison at said time and until August 27, 1897, was a director of said bank, and all the business of said bank, relating to the transactions involved in this suit were conducted by the said Donnan and Allison. *Answer:* Adopted.

5. In the month of November, 1891, prior to the said sheriff's sale, all the parties interested considered the said property worth more than the aggregate of all the debts against it. *Answer:* Denied.

6. On or about November 11, 1891, the Oil Well Supply Company was considering the conditions with respect to said leaseholds and property under execution and the values thereof, with a view to bidding upon the same to save its claim, when it was agreed between the said Oil Well Supply Company, John W. Donnan (representing the said Citizens National Bank, himself and Jonathan Allison), and John R. Hart (representing the firm of Hart Brothers), that the said Oil Well Supply Company should not bid at the sheriff's sale; that Jonathan Allison should buy in the leaseholds as cheaply as possible; that he

should convey the same to Guy and Thomas Hart, who should give a mortgage to said Allison for the debt due to the bank, himself and Donnan, and a subsequent mortgage to the Oil Well Supply Company for the entire indebtedness to it; that said Guy and Thomas Hart should take charge of the property and work upon the same at pumpers' wages; that the oil should be run to said Jonathan Allison, who should pay the expenses of operating, including the wages to Guy and Thomas Hart, and apply the balance to the payment of the Seep mortgage, and afterward the indebtedness to himself, Donnan and the bank. At that time it was thought by all parties that the oil to be produced from the wells would pay off all the indebtedness, to wit: the Seep mortgage, the Allison, Donnan and bank debt, and the Oil Well Supply Company debt, within two years, and the said Oil Well Supply Company therefore agreed to give to Guy and Thomas Hart the term of two years in which to pay off its debt. The said Guy and Thomas Hart on their part agreed to the arrangement, and agreed to take the property on the terms aforesaid. *Answer :* This finding, as a whole, is not adopted.

7. On November 14, 1891, the property was bid in by Jonathan Allison at the sheriff's sale for the sum of three hundred and ninety-one dollars ($391). The said Oil Well Supply Company was represented at said sale, but refrained from bidding, under the terms of its agreement with said Donnan. No assignment was ever made by said Allison of said property to said Guy and Thomas Hart, and no mortgage was ever given by them to said Oil Well Supply Company. *Answer :* This finding, as a whole, is not adopted. Substitute "Guy and Thomas Hart" for "Donnan" and it is adopted.

8. A few days after the said sheriff's sale the said leaseholds and property so purchased were placed in the management and control of said Guy and Thomas Hart, by whom said leaseholds were operated, and all the oil therefrom was run to the credit of said Allison, in pursuance of and under the terms of the said agreement, until January 22, 1894, when the said Guy and Thomas Hart, in consideration of $1.00, executed and delivered to said Allison and Donnan their "release, quitclaim and surrender" of all their right, title, interest or claim

in and to the said leasehold estates and in the property and material thereon; and thereafter, until this date, the said leaseholds have been operated and the oil produced therefrom received by the said Allison and Donnan. *Answer :* Adopted.

9. After the said sheriff's sale the said Oil Well Supply Company, at the instance and request of the said John W. Donnan, and as a part of the beneficial purpose of said purchase, advanced the sum of $1,399.96 toward the payment of labor claims made against the proceeds of sale of said leaseholds; and since then payments have been made by said Donnan and Allison out of the proceeds of the oil produced from said leaseholds, to the indebtedness of Hart Brothers due upon the Seep mortgage, to the indebtedness of Hart Brothers to the Citizens National Bank and to Donnan and Allison themselves, but no payments whatever have been made by them upon the indebtedness of Hart Brothers to the Oil Well Supply Company, nor upon the moneys advanced by the said company to pay the said labor claims; nor have said Donnan and Allison rendered any account to the Oil Well Supply Company for any of the receipts or disbursements on said property. *Answer :* Adopted.

The court answers the request on behalf of the Oil Well Supply Company, to find the following conclusions of law, as follows:

1. The said John W. Donnan and Jonathan Allison hold title to and possession of the said estates described in the second paragraph of the plaintiffs' bill, purchased by said Jonathan Allison at said sheriff's sale, in trust for the payment of the indebtedness to Joseph Seep, the Citizens National Bank, said John W. Donnan, said Jonathan Allison and said Oil Well Supply Company in the order here stated. *Answer :* Denied.

2. The said Oil Well Supply Company is entitled to a decree for an account of all the receipts from and expenditures on said property, since November 14, 1891, and a statement of account showing how much of the indebtedness to said Joseph Seep, said Citizens National Bank, said Jonathan Allison and said John W. Donnan has been paid, and what, if anything, is still due and unpaid of such indebtedness, as prayed for in the third paragraph of the prayers for relief of said Oil Well Supply Company. *Answer :* Denied.

## CONCLUSIONS OF LAW.

From the facts found we are of opinion, and find as follows:

1. Jonathan Allison purchased the nine leasehold estates in question and took title to the same from the sheriff, subject to the arrangement or agreement which John W. Donnan had made with Guy Hart and Thomas Hart, and the arrangement or agreement which James C. Boyce, as the attorney of the Oil Well Supply Company, had made with Guy Hart and Thomas Hart.

2. When a contingency arose which none of the parties anticipated, to wit: the refusal of Guy Hart and Thomas Hart to fully carry out their agreement and the surrender by them of their right to have conveyed to them the leasehold estates, equity and fair dealing required Jonathan Allison to afford the Oil Well Supply Company the option of taking the property on the same terms on which Guy Hart and Thomas Hart were to purchase it from him,—that is, by paying the Seep mortgage, the claims of the Citizens National Bank and John W. Donnan and Jonathan Allison, subject to the credit of the proceeds of oil produced and sold, less running expenses.

3. The offer made by John W. Donnan and Jonathan Allison to sell the property to the Oil Well Supply Company, which was refused on April 23, 1894, fully discharged any obligation which they owed to the said company, and it is not entitled to the relief prayed for.

## BECKETT ET AL. v. DONNAN AND ALLISON.

### REASONS IN SUPPORT OF FINDINGS OF FACT AND LAW.

The plaintiffs in their bill make the foundation of their claim an agreement which they aver was entered into by John R. Hart on behalf of himself, James Hart and Hart Brothers, and John W. Donnan and Jonathan Allison on behalf of the Citizens National Bank and James C. Boyce in behalf of the Oil Well Supply Company. (The terms of this agreement are hereinafter fully stated under the title " (3) On the whole case.")

They aver that the sheriff's sale of the property in dispute was made to Jonathan Allison " by virtue of and in accordance with said arrangement and agreement," and that the deed of assignment of date November 14, 1891, was executed and

delivered by John R. Hart and James Hart to Jonathan Allison to aid in carrying out the parol agreement; and further, " that John R. Hart and James Hart and Hart Brothers in all respects on their part complied with said arrangement and agreement; " and the court is asked to find and hold that this agreement thus averred constitutes a parol defeasance, and that the deeds of conveyance under which the defendants Donnan and Allison hold title " be decreed to constitute a mortgage of said leasehold estate." The question of fact, therefore, that confronts us at the very threshold of the plaintiffs' case is the one raised on these averments in the plaintiffs' bill. The parol agreement set up, being denied in the answer of the defendants, and being of a character to vary and modify the written conveyance in question, there can hardly be any question of the measure of proof required at the hands of the plaintiffs. It must be clear, precise and indubitable, and come from the mouth of at least two witnesses, or from sources that would be the equivalent of the testimony of two credible witnesses.

Applying this test we are clear that the plaintiffs have failed to establish the agreement which they set up. John R. Hart is the only witness, of those who would know, that testifies that there was such a contract, and he is flatly contradicted by the testimony of John W. Donnan, James C. Boyce and Guy Hart. That there was an agreement is not controverted; and therefore, in looking for corroborations of John R. Hart in the testimony of the witnesses other than those three witnesses who had a knowledge of the contract and its terms and who contradict him, we must keep in mind that fact. It is claimed that the testimony of Joseph Seep and H. McSweeney corroborates John R. Hart. It does, but not at the point where he needs corroboration. The terms of the contract could be what John W. Donnan, James C. Boyce and Guy Hart say they were,—that is, that the property was to be conveyed to Guy Hart and Thomas Hart absolutely and without condition if they paid certain debts, and still Mr. Seep and Mr. McSweeney testify as they did. It must be remembered, first, that the question discussed at the Oil City interview was not the terms of the arrangement. The amount due on the mortgage and the extension of the time of its payment, and its assignment, were the questions under consideration. Second, Mr. Seep and

Mr. McSweeney knew that all five of the Hart brothers had executed the mortgage concerning which they were talking and which it was proposed to assign. They did not want to do anything that was not satisfactory to the Hart Brothers,— that is, the five Hart brothers, and their recollection is that the arrangement talked of was to be beneficial to the Hart brothers, and that they were to have the property back when their mortgage and the bank's were paid. Mr. Seep in his testimony says, "the Hart brothers included John R. Hart, James Hart, Thomas Hart, Wm. Hart and Guy Hart."

It cannot, we think, be seriously contended that, upon the testimony of John W. Donnan, James C. Boyce and Guy Hart on the one side and John R. Hart, Joseph Seep and H. McSweeney on the other, the court could find that such an arrangement or agreement as is set up in the ninth paragraph of the plaintiffs' bill was ever entered into and consummated. But it is contended that the "attendant circumstances" in the case go to show "that the parties designed that Allison and Donnan should hold the leaseholds in mortgage with a reversionary interest in Hart Brothers." It is true that the attendant circumstances must be considered, and where there is no express contract they may be of such a character as to justify the court in finding that there was a contract, and they may be considered by way of corroboration where the question of contract is affirmed on one side and denied on the other. That is, circumstantial evidence, as well as direct, can be considered in determining whether the agreement averred to exist was entered into or not. But this does not change the measure of proof.

In this case there are a number of attendant circumstances relied upon which, taken alone, and unexplained, corroborate the testimony of John R. Hart. (1) John W. Donnan, after executions were issued, declared that he did not want the property, but all he wanted was that the debt to the bank, himself and Allison be made secure. (2) The Oil Well Supply Company refrained from bidding. (3) W. C. Hart was continued on the leases after the sale where he had worked before for the Hart Brothers. (4) The mortgage held by Seep, when paid, was assigned to Allison, and has never been satisfied. (5) Hart Brothers, after the sale, transferred to Allison certain articles

of personal property not levied upon by the sheriff on account of their indebtedness, etc.

It must be observed, however, that all of these attendant circumstances are just as consistent with the arrangements made by John W. Donnan and Guy Hart and Thomas Hart and James C. Boyce and Guy Hart and Thomas Hart (with the knowledge and consent of John R. Hart) as they are with the arrangement which John R. Hart says was made with him. And so it is with the other circumstances that are relied upon to corroborate John R. Hart. They do corroborate him when he says that an arrangement was entered into by John W. Donnan which contemplated the payment of the Seep mortgage, the mortgage of the bank and the indebtedness to himself and Allison, and a conveyance of the title by Allison, but they do not, in view of the other testimony in the case, corroborate him when he says that the reconveyance was to be made to himself and James Hart as Hart Brothers.

It may be, and we believe, that John R. Hart indulged the hope that a large increase in the price of oil might bring this valuable property back into his hands, but the only way that it could get there, under the testimony in this case, would have been through the generosity of his brothers, Guy and Thomas, and judging by their testimony they were inclined to favor John and James, had fortune favored them and they been able to secure a reconveyance from Jonathan Allison. This hope to thus repossess himself of the property would naturally take on the hue of a claim of right after Guy and Thomas gave up their right to purchase, and especially after oil had risen from sixty cents a barrel to $2.50. But whatever may have been the grounds of his belief that there was an agreement such as is set up in the plaintiffs' bill and such as would convert the conveyances under which Jonathan Allison took title into a mortgage, the plaintiffs have not by clear, precise and indubitable proof established the fact that there was such an agreement and, therefore, are not entitled to the decree they ask for. In so holding we do not, however, decide that they are not entitled, under proper pleadings, to have the liens enumerated in the agreement set up by the defendants satisfied so far as paid. But as we understood the counsel of the defendants at the argument, the right to this satisfaction is not denied.

(2) OIL WELL SUPPLY CO. v. DONNAN AND ALLISON.

In this issue the Oil Well Supply Company does not seek to have the conveyance which evidences the title of the leasehold estates decreed a mortgage, but avers that by reason of a certain agreement and the existence of certain facts fully set out in its cross bill, it is entitled to the decree of this court adjudging that the title and possession of the leaseholds in question are held by the defendants in trust for the payment of the Seep mortgage, the Citizens Bank mortgages, the indebtedness of Donnan and Allison, and the indebtedness of the Oil Well Supply Company.

We are satisfied from the evidence that the defendants and James C. Boyce, as representative of the Oil Well Supply Company, had an understanding when the property in question was purchased at the sheriff's sale that gave the Oil Well Supply Company certain equitable rights against the defendants as purchasers at that sale. At the time of the sale these parties were acting together for their mutual benefit. They both had contracts completed, or in process of completion, with Guy Hart and Thomas Hart which might secure to them through these Hart brothers as purchasers of the leaseholds from Allison, their respective claims. These contracts did not make Allison and Donnan responsible for the debt of the Oil Well Supply Company, yet they were both made on the assumed fact that Guy Hart and Thomas Hart would become the owners of the leaseholds by assignment from the sheriff's vendee. The Harts never became the purchasers of the leaseholds, and voluntarily surrendered their right to do so. This surrender made it necessary to readjust the rights of the defendants and the Oil Well Supply Company, and this could only be done on an equitable basis. The Oil Well Supply Company could not ask the defendants to assume the place of Guy and Thomas Hart and give it a mortgage and manage and operate the lease as they had done, neither could the defendants claim that the surrender of Guy and Thomas Hart cut up by the roots all claims of the Oil Well Supply Company. An equitable adjustment of their respective rights, therefore, must be found, and that, in our opinion, would be to allow the Oil Well Supply Company to take the place of Guy Hart and Thomas Hart and become the

purchasers of the leaseholds from Allison on the same terms on which the Harts were to get title to them. This would give the defendants all that they were to get from Guy and Thomas Hart, and it would place the Oil Well Supply Company in as favorable a position as if it had obtained the second mortgage which Guy and Thomas Hart agreed to give it, and which the defendants agreed to assist the company to get by not making an assignment of the title to them until it was given. This adjustment was evidently one that was recognized as equitable by the parties, for Mr. Donnan, when he learned that Guy and Thomas Hart were about to surrender, offered to sell or transfer to the company the leaseholds on their paying what was necessary to discharge the debts that were to be paid by Guy and Thomas Hart less the amount realized from oil after the expenses were paid. When this offer was made Mr. Boyce said that Allison and Donnan had done everything they had promised and that the company could not expect them to carry or operate the lease for it and that the proposition to turn the leaseholds over to them would be considered. It was considered and the company declined to take the property at the price.

It is contended that what took place between the parties in regard to this matter is not sufficient to justify the court in holding that the company thereby surrendered whatever equity they had by reason of the agreement at the time of the sale. But we think it is when we consider the attendant circumstances. Boyce knew (for he so expressed himself) that the company could not expect Allison to carry the leases for its benefit; he knew further that the company could not expect Allison to turn over the leases to the company on better terms than those on which Guy Hart and Thomas Hart were to purchase them. There was no room to dicker as to price. Mr. Donnan gave him in writing the amount that would pay the liens ahead of the Oil Well Supply Company under the agreement. He also gave him the amount of the sales of oil, and the proportion of this amount that was applied to expenses, and the amount applied to the payment of debts, and he gave him the then net monthly production. No question was raised as to the accuracy of these figures and, their accuracy being conceded, it fixed the only price at which the company could take the property. The matter was taken under advisement and the offer

declined. This declination, under the circumstances, was a surrender of any equity that the company had in the property.

## (3) ON THE WHOLE CASE.

Bringing the whole transaction before us in one view, what do we have? John R. and James Hart, hopelessly insolvent. Twelve oil properties in the aggregate worth, at forced sale, perhaps $60,000,—but worth very much more if the price of oil should increase,—about to be sold by the sheriff. John W. Donnan, president of the Citizens National Bank, fearful that the property will not sell for enough to pay the bank's claim of $20,000 and a fixed lien of $44,000. Guy and Thomas Hart, creditors of their brothers John and James to the extent of $17,000, with no security for the payment of their claim. James C. Boyce, as representative of the Oil Well Supply Company, who has an execution out for about $2,000, and has an additional claim against John and James Hart, for which it has no judgment, of about $7,000. Beside the bank and the Oil Well Supply people there are many other execution creditors. John and James, after making all possible effort to arrange matters so that a sheriff's sale of their property would not be necessary, finally conclude that nothing could be done to save anything for themselves, but express a desire that something, if possible, be done for their brothers, Guy and Thomas. Guy and Thomas have an interest in the leaseholds that are to be sold that are not covered by the executions. Donnan is anxious to secure the claim of the bank; he also has an individual claim in which he and Jonathan Allison are interested, away down on the list of liens. He proposes that if Guy and Thomas will give a mortgage on their interest to the bank as a collateral to secure its claim and will pay the individual claim of Allison and himself, that he will have Allison buy the property at sheriff's sale, if it can be done on a bid that would not exceed an amount that would cover the claim of the bank; and if Allison gets the property that he will convey it to Guy and Thomas if they will pay the Seep mortgage, the bank's claim and the claim of Allison and Donnan within two years or satisfactorily secure the payment thereof,—Guy and Thomas to manage the property and to receive pumpers' wages, and the oil to be run to the credit of Allison, the proceeds

thereof, after paying running expenses, to be applied to the payment of these claims, Donnan to carry the Seep mortgage or see that it is not foreclosed. This proposition is made in the presence of John and James Hart and in pursuance of their suggestion. The proposition is, after consideration, accepted and Guy and Thomas execute a mortgage on their interest in the leaseholds, as collateral security for the bank's claim. After this had been done Mr. Boyce, for the Oil Well Supply Company, concludes that his company would not, in the protection of its interest, be safe in bidding in the property at a figure higher than Donnan had agreed to bid in order to get it for Guy and Thomas. He, therefore, gets John Hart to see his brothers, and sees them himself, and proposes to them that he will not bid against Donnan or interfere with their plans, a thing he had already concluded he would not do, if they will also agree to pay the Oil Well Supply Company's claim out of the proceeds of the oil before they pay themselves, but after Seep, the bank and Donnan and Allison are paid. They agreed with Boyce in the presence, and with the approval, of Donnan to do this, and further to give a mortgage on the leaseholds that Allison would convey them under Donnan's contract to secure the payment of this claim of the Oil Well Supply Company, after the other claims are paid. On the day before the sale Boyce prepared a written agreement between the Oil Well Supply Company and Guy and Thomas Hart, which not only provided for the giving of a mortgage but of their individual notes. The Harts refused to sign this agreement, but offered to give the mortgage, claiming that they had not agreed to give notes but only to pledge the property they were to get from Allison. Donnan agrees with Boyce just before the sale that if Allison gets the property he will not convey it to Guy and Thomas Hart unless they give the mortgage to the Oil Well Supply Company. Boyce attends the sale but does not bid, and Allison becomes the purchaser. Either before or after sale John R. Hart assisted Donnan to make satisfactory arrangements with Seep, the holder of the first mortgage. After more than two years Guy and Thomas Hart refused to take the property, and surrendered all their claim to it. At the time of the surrender the mortgage to the Oil Well Supply Company had not been given by Guy and Thomas Hart, and of the indebtedness to Seep, the bank and

Donnan and Allison (then amounting, principal and interest, to near $85,000) $51,000 remained unpaid. Donnan and Allison upon the surrender of Guy and Thomas Hart offered to convey or turn over the leaseholds to the Oil Well Supply Company if they would pay this balance of $51,000, which Guy and Thomas Hart were bound under their contract to pay before the Oil Well Supply Company's mortgage on their interest should be paid. This the company refused to do.

Nearly three years after the surrender of Thomas and Guy Hart was made, and after Donnan and Allison had risked the expenditure of large sums of money in drilling new wells and improving the property, the plaintiffs filed their bill in equity and the Oil Well Supply Company, by order of court, is brought in as a necessary party. The plaintiffs allege that there was a parol agreement between Donnan, John Hart and the Oil Well Supply Company that makes Allison's deeds of conveyance a mortgage, with the equity of redemption in John R. Hart and James Hart, doing business as Hart Brothers. The Oil Well Supply Company say that Allison and Donnan hold the property in trust to pay the claims of Seep, the bank, Donnan, Allison and the Oil Well Supply Company in the order named. Neither claim, in our opinion, has been established. The parol agreement set up by the plaintiffs has not been proved, and the facts established do not warrant the court in finding that the defendants hold the property in trust.

It will have to be admitted that there is no express trust or implied trust. There certainly is no resulting trust. Was there anything done, then, by the defendants that would warrant the court in constructing a trust in order to do equity between the parties? There has not been a particle of evidence introduced to show that the defendants at the time of the sale, or prior thereto, were guilty of any fraud upon John R. and James Hart, or upon the Oil Well Supply Company, so that we could say they were trustees ex maleficio. The Oil Well Supply Company and the defendants were acting together in this sale under agreements which they each had with Guy and Thomas Hart, and of which the Hart Brothers had full knowledge, and the making of which they suggested. Neither did the purchase of the property in dispute by Allison and Donnan put them in a position of advantage which they have abused to

the injury of the Hart Brothers or the Oil Well Supply Company so as to warrant the court in raising a trust in order to protect their rights. Donnan and Allison did everything they promised for the Oil Well Supply Company, and when Guy and Thomas Hart surrendered or refused to take the property according to their agreement and to give the mortgage they had promised, Allison and Donnan offered the property to the Oil Well Supply Company on the same terms that it was to go to Guy and Thomas Hart, and they refused to take it. This was more than two years and a half before the bill in this case was filed, and we think the evidence does not warrant the court in now finding that the defendants, by construction of law, now hold their title in trust to pay the Oil Well Supply Company's claim.

It will be observed that the question here is not " did the parties by the agreement create a trust," which once a trust is always a trust, but it is this : " Was the relation of the parties to each other and to the property in question at the time the bill was filed such as, in equity and good conscience, requires the court now to raise a trust,—a constructive trust,—in the interest of the parties seeking relief ? "

Let a decree be drawn in accordance with the findings hereinbefore set out, the plaintiffs to pay the costs.

### FINAL DECREE.

And now, February 21, 1898, this cause came on to be further heard and was argued by counsel and thereupon, upon consideration thereof, it is ordered, adjudged and decreed as follows: (1) that the original bill and the amended bill filed by John W. Beckett, assignee, et al., be and they are hereby dismissed; (2) that the cross bill filed by the Oil Well Supply Company, be and it is hereby dismissed; (3) that the costs of this proceeding be paid by the said John W. Beckett, assignee, and Luella Hart, administratrix.

*Error assigned* among others was decree dismissing bill.

*S. D. Mitchell,* with him *J. W. Lee* and *J. B. Chapman,* for appellants.—Sweetzer's Appeal, 71 Pa. 264, is fully decisive of this case in plaintiff's favor.

A conveyance absolute on its face may be shown to be a security for money loaned, and this by oral testimony : Kunkle v. Wolfersbergcr, 6 Watts, 126 ; Hiester v. Maderia, 3 W. & S. 384 ; Houser v. Lamont, 55 Pa. 311 ; Harper's App., 64 Pa. 315.

Gross inadequacy of price has always been considered as an indication that the conveyance was a mortgage : 1 Jones on Mortgages, sec. 275 ; Stoever v. Stoever, 9 S. & R. 434 ; Hamet v. Dundass, 4 Pa. 178 ; so also the fact that the grantor still retains possession of the land after execution of the conveyance is a circumstance of weight to determine the question of mortgage : Rhines v. Baird, 41 Pa. 256 ; Todd v. Campbell, 32 Pa. 250 ; also deterring bidders from bidding at a sheriff's sale is always a badge of mortgage : Sweetzer's App., 71 Pa. 264 ; Heath's App., 100 Pa. 1.

The fact that Donnan requested and Hart Brothers granted the deed of assignment is most conclusive evidence that there was an amicable arrangement between Donnan and Hart Brothers relative to the disposition of the leaseholds, and that the latter were laboring to effect that arrangement. The sheriff's sale was not an adverse proceeding : Gaines v. Brockerhoff, 136 Pa. 175.

Wherever a conveyance or assignment of an estate is originally intended as a security for money, whether this intention appears from the deed itself or from any other instrument, it is always in equity considered as a mortgage, and the estate redeemable, even though there be an express agreement that it shall not be redeemable, or that the right of redemption shall be confined to a particular time or to a particular description of persons : Jacques v. Weeks, 7 Watts, 261 ; Kellum v. Smith, 33 Pa. 158 ; Guthrie v. Kahle, 46 Pa. 331 ; Halo v. Schick, 57 Pa. 319 ; Bispham's Equity, sec. 154 ; Huoncker v. Merkey, 102 Pa. 462 ; Odenbaugh v. Bradford, 67 Pa. 96 ; Rhines v. Baird, 41 Pa. 256 ; Russell's App., 15 Pa. 319 ; Wallace v. Smith, 155 Pa. 78 ; Null v. Fries, 110 Pa. 521.

*D. F. Patterson,* with him *A. M. Todd* and *James A. Wiley,* for appellees.—All the cases agree that the testimony and circumstances tending to show that a writing purporting to be an actual sale was so understood by the parties, are to be considered, as well as the testimony and circumstances tending to

show that the writing was intended merely as security for a debt, and, unless upon consideration of the whole case, the facts and circumstances are found to be inconsistent and irreconcilable with the absolute conveyance, no decree affecting the writing will be made: Lance's App., 112 Pa. 456; Danzeisen's App., 73 Pa. 65; Kimmel v. Smith, 117 Pa. 183; Jones v. Pierce, 134 Pa. 533; Fisher v. Witham, 132 Pa. 488; Null v. Fries, 110 Pa. 521; Wallace v. Smith, 155 Pa. 78; Sweetzer's App., 71 Pa. 264; Gaines v. Brockerhoff, 136 Pa. 175.

PER CURIAM, October 31, 1898:

A careful study of this case has convinced us that the opinion of the learned court below is entirely correct. It seems to us that the learned judge in his exhaustive and elaborate treatment of the case has so fully vindicated his findings of fact and conclusions of law that nothing that we could say would add any force to his reasoning. We affirm the decree upon the findings of fact and conclusions of law contained in the opinion.

Decree affirmed and appeal dismissed at the cost of the appellant.